**Electronically FILED by
Superior Court of California,
County of Los Angeles
4/23/2026 2:41 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By P. Rodriguez, Deputy Clerk**

JASMIN JOSEPH
16 DUNBAR ST
YONKERS, NY 10710
Phone Number 914-262-9934
Fax Number:  N/A
Email: JOSEPH.JASMINJ@GMAIL.COM


JASMIN JOSEPH, IN PRO PER


**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**


| | |
|---|---|
| JASMIN JOSEPH,<br><br>          Plaintiff,<br><br>   vs.<br><br>PRODUCERS GUILD OF AMERICA, INC., A California Corporation and DOES 1-20, inclusive<br><br>          Defendant. | ) Case No.: __26STCV13089__<br>)<br>) **COMPLAINT FOR:**<br>)<br>)<br>)     1) **FEHA RETALIATION (Cal. Gov't Code § 12940(h));**<br>)     2) **CFRA INTERFERENCE (Cal. Gov't Code § 12945.2);**<br>)     3) **CFRA RETALIATION (Cal. Gov't Code § 12945.2);**<br>)     4) **FAILURE TO PREVENT DISCRIMINATION AND RETALIATION (Cal. Gov't Code § 12940(k));**<br>)     5) **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (CONSTRUCTIVE DISCHARGE)**<br>)<br>) **DEMAND FOR JURY TRIAL**<br><br>_____   **(Amount Exceeds $35,000)** |

Plaintiff, JASMIN JOSEPH ("Plaintiff"), alleges on information and belief, as follows:

## INTRODUCTION AND PARTIES

1.    Plaintiff Jasmin Joseph ("Plaintiff") brings this action arising from her employment with Defendant Producers Guild of America, Inc. ("PGA," "the Guild," or "Defendant"), where she was employed as Membership Manager from August 2021 through June 26, 2024.

2.    Defendant is a California non-profit corporation organized and doing business in the State of California, with its principal place of business at 11150 West Olympic Blvd., Suite 980, Los Angeles, California 90064. Plaintiff is currently a resident of the State of New York, but was a resident of Los Angeles at the time of the events alleged herein.

3.    During her employment, Plaintiff disclosed that her aunt—who had raised her—had been diagnosed with cancer and that Plaintiff would require flexibility to provide caregiving and family support. Following that disclosure and subsequent protected activity, Plaintiff was subjected to a series of adverse actions, including the reassignment of her responsibilities, increased scrutiny, and exclusion from advancement opportunities.

4.    Plaintiff ultimately resigned after these conditions remained unresolved throughout her aunt's illness and persisted thereafter. Plaintiff brings this action for retaliation, interference with her rights under the California Family Rights Act, failure to prevent unlawful conduct, and constructive discharge.

5.    Plaintiff sues fictitious Defendants DOES 1 through 20, inclusive, pursuant to California Code of Civil Procedure § 474, because their true names and capacities are presently unknown. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Defendants is responsible in some manner for the conduct alleged herein. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

6.     Plaintiff is informed and believes, and on that basis alleges, that all acts and omissions described in this Complaint were performed by Defendants, and that each Defendant was acting as an agent, employee, joint venturer, co-employer, or under the direction and control of the others. Plaintiff further alleges that such acts and omissions were within the course and scope of such relationships and were authorized, ratified, or otherwise approved by each Defendant.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action because the amount in controversy exceeds the jurisdictional minimum of the Superior Court of the State of California, and Plaintiff seeks damages in excess of $35,000.

8.     This Court has personal jurisdiction over Defendant PRODUCERS GUILD OF AMERICA, INC. because Defendant is a California non-profit corporation with its principal place of business in Los Angeles County, California, and the unlawful conduct alleged herein occurred in Los Angeles County.

9.     Venue is proper in Los Angeles County pursuant to California Code of Civil Procedure § 395(a) because Defendant's principal place of business is located in Los Angeles County, and the events and omissions giving rise to this action occurred in Los Angeles County.

## FACTUAL ALLEGATIONS

**A. Performance History and Early Contributions**

10.     At all relevant times, Defendant employed five or more employees and was therefore subject to the California Family Rights Act ("CFRA"). Defendant utilized TriNet as its human resources platform and payroll administrator. Plaintiff's starting salary was $60,000 per year, which increased to $77,000 per year by 2024.

11.     During her tenure, Plaintiff assumed significant operational responsibilities, including overseeing membership application vetting, Salesforce data management, backlog reduction, and the development of workflow systems used across the department.

12.     Prior to Plaintiff's employment, membership application review and backlog management was supported by a rotating committee of volunteer members. Responsibility was later consolidated under the Director of Membership alone, during which time the backlog grew to approximately 400 applications. After Plaintiff assumed primary responsibility for membership application review alongside the Director, the backlog was reduced to approximately 50 applications through workflow development and system restructuring. Plaintiff processed over 600 applications between August 2021 and June 2024.

13.     Plaintiff received positive performance evaluations in 2022 and 2023, which described her as "competent, dynamic, and adaptable." She did not receive a performance evaluation in 2024.

14.     In April 2022, Plaintiff raised concerns regarding her compensation relative to the scope of her responsibilities and market rates. She was informed that workplace "flexibility" constituted part of her overall compensation structure.

15.     Plaintiff nevertheless continued to contribute beyond her formal responsibilities to support Guild programming and events, including assisting with screenings in both New York and Los Angeles. On one occasion, while in Los Angeles, Plaintiff utilized her New York–based network to bolster attendance at a Guild screening event in response to attendance shortfalls, thereby helping to avoid a poorly attended Guild event.

16.     Early in her tenure, Plaintiff also assisted with executive-level communications, including drafting talking points for executive leadership and the Guild's then-presidents for board meetings and dinners, as well as supplementing and strengthening briefing materials

- 4 -

prepared for major Guild events, including the 2023 PGA Awards Breakfast. These contributions were performed voluntarily and without additional compensation.

17. During Plaintiff's employment, the Guild maintained a flexible, hybrid, and geographically distributed work environment with no formal, uniformly applied remote work policy. Plaintiff and her colleagues regularly worked from various locations, including Los Angeles, Orange County, Palm Springs, Park City, New York City, Westchester County, and, on occasion, internationally in Mexico and Spain. The "return to office" mandate following the COVID-19 pandemic was applied unevenly, with individual employees maintaining their own in-office requirements based on personal preference or managerial discretion rather than any written standard. No discrete approval process for remote work existed; employees generally notified management of their plans and continued working without documented resistance. Plaintiff utilized this flexible system in the same manner as her colleagues, working remotely and from various locations as needed to perform her job duties. Only after Plaintiff disclosed her aunt's cancer diagnosis and requested accommodation did Defendant subject her remote work arrangements to heightened scrutiny.

18. Employees were typically promoted from manager-level positions to director or associate director roles within approximately two years of their start dates, with such promotions publicly announced or otherwise observable through LinkedIn profiles or workplace communications. After approximately two years of employment, Plaintiff was expressly excluded from a newly created senior-level role. Despite receiving positive performance evaluations and having been employed for nearly three years, Plaintiff was never promoted.

**B. Caregiving Disclosure and CFRA Notice Failure**

19. On February 22, 2023, Plaintiff notified her direct supervisor, Director of Membership Bryce Averitt and then-National Executive Director (now CEO) Susan Sprung that her aunt – who had raised her from childhood – had been diagnosed with cancer. Plaintiff explained that she would need to travel to provide caregiving support and that additional requests for leave or remote work might follow as her aunt's condition progressed.

20. Defendant did not provide Plaintiff with any CFRA eligibility notice.

21. Defendant did not provide Plaintiff with any CFRA rights and responsibilities notice.

22. Defendant did not provide Plaintiff with any CFRA designation notice.

## C. Post-Disclosure Adverse Treatment

23. On June 2, 2023, Associate National Executive Director Michelle Byrd circulated an email to all Guild staff formally introducing the new Digital Marketing Manager. The announcement did not include responsibility for membership application processes, New Member Welcome programming, or census-related initiatives.

24. On June 6, 2023, during a weekly staff call, Ms. Byrd raised a question to staff regarding low submission numbers for the documentary cycle of the PGA Create Fellowship. In response, Plaintiff noted that she had observed, in passing on social media, individuals advising "pre-WGA" writers not to apply to fellowships during the Writers Guild of America strike. Although the PGA Create Fellowship documentary cycle did not involve scripted work, Plaintiff indicated that such messaging may have contributed to confusion or hesitancy among potential applicants. Plaintiff's comment was brief and responsive to the inquiry. The suggestion was disputed during the call. Shortly thereafter, following executive consultation with the Writers Guild, the documentary cycle of the PGA Create Fellowship was indefinitely postponed.

25.    On June 9, 2023, Ms. Byrd circulated a staff-wide email emphasizing employees' obligation to proactively share information that could impact Guild programs or reputation. The message was understood by staff, including Plaintiff, as referencing the June 6 discussion.

26.    Beginning shortly after the Digital Marketing Manager's June 12, 2023 start date, the Digital Marketing Manager was instructed to edit New Member Welcome communications and became involved in new member application processes and related data collection—initiatives that had previously been managed by Plaintiff.

27.    On June 27, 2023—approximately two weeks after the Digital Marketing Manager began performing those functions—Plaintiff received a performance review evaluating her on continued development of "New Member Welcome/Orientation," "Membership Application UI/UX," and "Utilizing census and demographic info towards Guild operations (e.g., digital marketing)."

28.    In late September 2023, Plaintiff was informed that her aunt's cancer had progressed and was likely incurable, increasing her need for flexibility in the period leading up to the October 2023 meeting described below.

29.    On October 18, 2023, Plaintiff requested a meeting with Mr. Averitt and Ms. Byrd to discuss relocating to New York due to her aunt's deteriorating health.

30.    On October 23, 2023, Plaintiff was asked to prepare a list of her current responsibilities in advance of the meeting. The meeting was initially scheduled for on or about that day but was rescheduled to October 27, 2023, at 4:00 p.m.

31.    Rather than addressing relocation or logistical accommodations, the October 27, 2023 meeting became a performance-focused discussion. Ms. Byrd stated that Plaintiff had been excluded from certain projects because they had been "butting heads." Ms. Byrd also

raised concerns regarding Plaintiff's in-office attendance and a perceived lack of executive clarity regarding her daily work responsibilities.

32.    During the same discussion, Ms. Byrd acknowledged that she had, at times, avoided direct communication regarding her concerns, describing her approach as "ghosting" instead of addressing perceived conflict directly.

33.    No formal action items, written performance plan, or corrective directives resulted from the October 27 meeting. No response was provided to Plaintiff's accommodation request.

34.    Immediately following the meeting, Plaintiff contacted Mr. Averitt via Teams to debrief. She asked whether he had anticipated the performance-focused nature of the discussion. He indicated that he had not.

35.    The work-arrangement discussion remained unresolved through late 2023. A subsequent meeting regarding relocation and accommodations was scheduled for Friday, December 8, 2023. On the morning of that meeting, Plaintiff's aunt passed away. The accommodation process remained unresolved until her aunt's death.

**D. January 2024 PTO Escalation**

36.    Shortly after returning from the holiday office closure, Plaintiff became ill and utilized approximately four consecutive accrued sick days. During this period, she completed the time-sensitive PGA Awards invitation list project, working extended hours to ensure timely delivery.

37.    Upon delivering the project to the Events team, Plaintiff submitted a request for two weeks off: approximately one week of accrued paid time off (PTO) and one week of unpaid leave, to rest and recover following bereavement and illness. Historically, PTO requests were handled by Plaintiff's direct supervisor, Mr. Averitt. In this instance, the request was escalated to executive leadership without explanation.

- 8 -

38. On January 16, 2024, Plaintiff was called to an impromptu meeting with Ms. Byrd and Mr. Averitt regarding this request. Ms. Byrd questioned whether Plaintiff intended to leave the organization despite Plaintiff having provided no notice of resignation.

**E. March 2024 Protected Activity and Adverse Action**

39. In March 2024, the Guild circulated a policy that would affect eligibility for the Producers Mark designation, a major gatekeeping function of the Producers Guild with implications for Academy Award eligibility.

40. On March 11, 2024, consistent with management's directive that employees should proactively share information that could impact Guild programs or reputation (as alleged in Paragraph 33), Plaintiff circulated a written, researched communication to all Guild staff responding to the proposed crowdfunding policy. In that communication, Plaintiff explained that the policy would disproportionately disadvantage emerging filmmakers, particularly those from underrepresented groups (including veterans, women, people of color, and disabled persons) and those outside traditional Hollywood financing networks, because such filmmakers often rely on crowdfunding and the associated producer credits to secure financing.

41. On March 21, 2024 – ten days after Plaintiff's March 11 communication – Defendant posted a newly created senior-level position titled "Associate Director of Membership and Member Engagement." The job listing was substantially similar to the job description document Plaintiff had previously provided to management (as alleged in Paragraph 25). The new role was advertised at a starting salary within the range Plaintiff had identified during the discussion referenced in Paragraph 14.

42. The similarities between the new role and Plaintiff's position were apparent.

43. On March 22, 2024, at 11:05 a.m., a colleague sent an email to Defendant's executive team – including Ms. Byrd, General Counsel, Susie Casero, and Ms. Sprung – with Plaintiff

- 9 -

copied. The email specifically praised Plaintiff as a "tireless VLOOKUP guru" and credited her with the success of implementing a major project that facilitated the recruitment of new members following the PGA Awards.

44.    Later that same day, March 22, 2024, Plaintiff was informed that a meeting would be held regarding "Membership Department changes." During that meeting, Plaintiff was told that, despite never having been placed on a performance improvement plan or issued formal discipline, the new role had been created due to concerns regarding her performance and that she was not eligible for consideration. Ms. Byrd repeatedly referenced Plaintiff's March 11, 2024 email and questioned why Plaintiff had raised the issue in that manner.

45.    Following the March 22 meeting, Plaintiff sought written clarification of her job responsibilities in light of the restructuring details. She received no response.

**F. Internal Complaint and Investigation**

46.    The new role was filled on April 19, 2024, with a start date of April 22, 2024 – less than one month after the position was posted. The hired employee's resume reflected a gap in employment between 2018 and the 2024 hire.

47.    On or about April 22, 2024, Plaintiff filed a formal 19-page complaint outlining concerns regarding retaliatory treatment, role overlap, compensation disparity, exclusion from departmental initiatives, performance characterizations, and the Guild's handling of her medical caregiving disclosures. The Guild retained an outside investigator.

48.    While the investigation was pending, Plaintiff was required to train the individual hired into the newly created position on core membership systems and processes she had developed and maintained. The training session lasted approximately one hour and was recorded.

49.    On or about May 23, 2024, Defendant issued a one-page determination stating that it was "unable to substantiate allegations of retaliation and/or discrimination toward [Plaintiff]

- 10 -

by Michelle Byrd." Plaintiff was informed of this determination during a meeting lasting approximately five minutes, which was attended by Ms. Casero and Ms. Sprung. Ms. Casero led the meeting, and Ms. Sprung did not speak.

50.     The investigation addressed whether a single individual violated Guild policy and did not address the broader organizational issues alleged, including performance documentation inconsistencies, compensation and role disparity, or the absence of dedicated HR infrastructure. Following the meeting, Plaintiff requested to review the underlying investigation findings, but was informed that such materials were privileged and would not be provided.

51.     The sole action item identified in the determination was clarification of Plaintiff's job responsibilities through the production of a job description document – nearly three years into her employment.

52.     On June 6, 2024, Plaintiff was given approximately two hours' notice of an in-office meeting, where she was presented with a job description and informed of new in-office requirements. Ms. Casero, Ms. Byrd, and Mr. Averitt were present, either in person or virtually. These changes altered the conditions of Plaintiff's employment and were imposed without comparable requirements on similarly situated employees. Plaintiff observed that in these documents, the title of the new role had been changed from "Associate Director of Membership and Member Engagement" to "Associate Director, Member Experience" – a refocus away from functions that overlapped with Plaintiff's own responsibilities. No explanation was provided for the change.

53.     On June 10, 2024, Plaintiff submitted a written response to Ms. Casero, Ms. Byrd, and Mr. Averitt, identifying substantial overlap between her role and the Associate Director position and requesting clarification regarding the salary disparity and the title change. She received no response.

**G. Resignation and Disparate Treatment**

54.    In practice, the only result of the investigation was formalization of in-office requirements and individualized oversight for Plaintiff, while other managerial employees continued flexible and informal work arrangements without comparable stringency.

55.    On at least one occasion following the investigation, while adhering to her newly imposed requirements, Plaintiff was the only person working from the office.

56.    These conditions required Plaintiff to submit to heightened scrutiny and diminished responsibilities not imposed on her peers.

57.    On or about June 21, 2024, Plaintiff observed that multiple staff members were working remotely, including then-Manager of Programs and Events. When Plaintiff inquired about their remote work process, the employee informed Plaintiff that they had simply notified management and "they didn't seem to mind," and expressed confusion as to why Plaintiff encountered resistance, particularly given that the employee's role required more regular in-person engagement. That employee was promoted in or around January 2026, within a timeframe generally consistent with the Guild's typical promotion practices.

58.    On or about June 25, 2024, Plaintiff met with Ms. Casero to discuss her employment status. During the meeting, Plaintiff requested an amicable separation from the organization. That request was declined. Following that meeting, Plaintiff separately requested that Mr. Averitt terminate her employment so that she could access unemployment benefits. That request was also declined.

59.    On June 26, 2024, Plaintiff tendered her resignation.

**H. Post-Employment Conduct**

60.    In July 2024, Plaintiff applied for unemployment benefits. The Guild contested her eligibility.

61.     Following her resignation, including a period of continued underemployment and the Guild's contest of her unemployment benefits, Plaintiff was compelled to withdraw funds from her retirement account and to utilize the only liquid assets available to her – the inherited funds left by her aunt whose terminal condition had necessitated her request for protected leave – in order to meet ordinary living expenses. These withdrawals resulted in tax penalties, adverse tax consequences, and long-term financial impact.

62.     After an administrative hearing, the California Unemployment Insurance Appeals Board issued a decision on November 20, 2024 (Case No. 10378213) finding that Plaintiff had shown good cause for voluntarily leaving her employer. The Board reversed the prior determination that she was disqualified from receiving benefits and awarded retroactive benefits.

63.     As a result of the Guild's opposition, Plaintiff experienced a period of approximately four and a half (4.5) months without steady income while her appeal was pending.

64.     Following Plaintiff's resignation and during the pendency of the unemployment proceedings, the Guild implemented structural changes to its human resources infrastructure, including the creation of a "Controller/HR Director" role. The Guild also updated its personnel management record system and revised its performance evaluation framework. The performance evaluation changed from a single-page format to a multi-page rubric requiring executive and legal oversight. Plaintiff is informed and believes that, in advance of the 2024 performance review cycle, the Guild undertook efforts to revise and formalize employee job descriptions.

65.     The "Controller/HR Director" role included responsibilities related to employee onboarding and offboarding, leave administration, accommodations, complaint handling, employment documentation, and maintenance of personnel records. These functions had not been supported by formalized or centralized infrastructure during Plaintiff's employment.

66.      The Guild revised the policy described in Paragraph 39 on April 17, 2024, and again on September 24, 2024. The revisions addressed issues raised in Plaintiff's March 11, 2024 email.

67.      Following Plaintiff's departure, the Membership Department expanded from two employees to four employees while maintaining productivity levels comparable to those achieved during Plaintiff's tenure from 2021 through 2024.

**I. TriNet Logs Produced by Defendant**

68.      On February 28, 2026, Plaintiff served a pre-litigation demand letter on Defendant, which included a request for her personnel file pursuant to California Labor Code § 1198.5.

69.      On March 11, 2026 – days after Defendant's March 9, 2026 response to Plaintiff's demand letter – Defendant generated multiple reports from its TriNet human resources platform related to Plaintiff's terminated employee record.

70.      These reports show entries for Plaintiff's employee record in relation to specific policies, with corresponding date and time stamps, including:

(a) A "Family and Medical Leave Act" policy entry dated May 3, 2023 at 4:01 p.m.;

(b) A "Worksite Employee Handbook" policy entry dated October 18, 2023 at 2:11 p.m.;

(c) An "Employee Acknowledgement" policy entry dated October 18, 2023 at 2:08 p.m..

71.      These dates are contemporaneous with: (a) a May 2, 2023 request from Mr. Averitt that Plaintiff cover an LA-based screening for a member of the Events team who would be in New York; and (b) the date Plaintiff requested a meeting to discuss relocating, as described in Paragraph 35.

72.      The reports redact certain columns. Plaintiff will seek complete, unredacted, and contextualized logs through discovery.

- 14 -

**FIRST CAUSE OF ACTION**
**Retaliation in Violation of the Fair Employment and Housing Act**
**(Cal. Gov't Code § 12940(h))**

**(Against Defendant Producers Guild of America, Inc. and DOES 1–20)**

73.    Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

74.    Plaintiff engaged in protected activity by opposing conduct she reasonably believed to be unlawful and by raising concerns regarding Guild policies and practices, including but not limited to her March 11, 2024 communication (¶ 40).

75.    Defendant subjected Plaintiff to adverse employment actions, including but not limited to exclusion from a newly created senior-level role that encompassed her existing role and responsibilities, and the imposition of heightened scrutiny and oversight not applied to similarly situated employees (¶¶ 44-45).

76.    Plaintiff's protected activity was a substantial motivating reason for Defendant's adverse actions.

77.    Defendant's stated reasons for its actions were a pretext for unlawful retaliation.

78.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, emotional distress, and other damages according to proof.

**SECOND CAUSE OF ACTION**
**Interference with Rights Under the California Family Rights Act**
**(Cal. Gov't Code § 12945.2)**

**(Against Defendant Producers Guild of America, Inc. and DOES 1–20)**

79.    Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

80.    Plaintiff was eligible for leave under the California Family Rights Act ("CFRA").

81.     Plaintiff provided Defendant with notice of a qualifying need for leave, including her February 22, 2023 disclosure that her aunt had been diagnosed with cancer and required caregiving support (¶ 19).

82.     Defendant failed to provide required CFRA notices, including eligibility, rights and responsibilities, and designation notices (¶¶ 20–22).

83.     Defendant's failure to provide these notices and its failure to engage in the CFRA process interfered with Plaintiff's exercise of her CFRA rights.

84.     Defendant further interfered with Plaintiff's CFRA rights by engaging in conduct that would reasonably tend to discourage an employee from taking or continuing to take protected leave, including subjecting Plaintiff to increased scrutiny, performance-related criticism in response to accommodation requests, and escalating routine employment matters following her disclosure of a need for leave (¶¶ 30–35, 37–38).

85.     As a direct and proximate result of Defendant's interference, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, emotional distress, and other damages according to proof.

## THIRD CAUSE OF ACTION
### Retaliation in Violation of the California Family Rights Act
### (Cal. Gov't Code § 12945.2)

**(Against Defendant Producers Guild of America, Inc. and DOES 1–20)**

86.     Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

87.     Plaintiff engaged in protected activity by notifying Defendant of her need for caregiving leave and requesting flexibility to provide such care.

88.     Following Plaintiff's protected activity, Defendant subjected Plaintiff to adverse employment actions, including exclusion from advancement opportunities, reassignment of responsibilities, increased scrutiny, and escalation of routine requests.

- 16 -

89.    Plaintiff's protected activity was a substantial motivating reason for Defendant's adverse actions.

90.    As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, emotional distress, and other damages according to proof.

## FOURTH CAUSE OF ACTION
### Failure to Prevent Discrimination and Retaliation
### (Cal. Gov't Code § 12940(k))

**(Against Defendant Producers Guild of America, Inc. and DOES 1–20)**

91.    Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

92.    Defendant failed to take all reasonable steps necessary to prevent discrimination and retaliation in the workplace.

93.    Such failures included, but were not limited to, the absence of adequate human resources infrastructure (¶¶ 64-65), the lack of uniform policies governing leave and workplace flexibility, and the failure to conduct a meaningful and adequate investigation into Plaintiff's complaints (¶¶ 49-50, 53).

94.    As a direct and proximate result of Defendant's failure to prevent unlawful conduct, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, emotional distress, and other damages according to proof.

## FIFTH CAUSE OF ACTION
### Wrongful Termination in Violation of Public Policy (Constructive Discharge)

**(Against Defendant Producers Guild of America, Inc. and DOES 1–20)**

95.    Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

96.     At all relevant times, Defendant was Plaintiff's employer within the meaning of California law.

97.     Following Plaintiff's caregiving-related disclosures and protected activity, Defendant subjected Plaintiff to working conditions that were so intolerable that a reasonable person in her position would have felt compelled to resign.

98.     These conditions included, but were not limited to:

(a) the removal and public reassignment of core responsibilities that Plaintiff had previously managed, followed by continued evaluation on those responsibilities (¶¶ 26-27);

(b) the creation of a senior-level role encompassing those functions, coupled with Plaintiff's exclusion from consideration for that role (¶ 44);

(c) requiring Plaintiff to train the individual hired into that position on systems and processes she had built and maintained (¶ 48);

(d) the imposition of individualized in-office requirements and heightened scrutiny not applied to similarly situated employees (¶¶ 52, 54–57);

(e) the failure to provide clarity regarding Plaintiff's role, responsibilities, or path for advancement despite repeated requests (¶ 53); and

(f) the expansion of the Membership department and redistribution of responsibilities Plaintiff had previously managed, without corresponding advancement or opportunity for Plaintiff (¶¶ 52, 67).

99.     Collectively, these actions materially altered the terms and conditions of Plaintiff's employment, stripped Plaintiff of advancement opportunities and equitable working conditions, while requiring her to continue performing a workload that was substantial and disproportionate to her stated title.

100.     Plaintiff's conditions were not uniformly applied, and similarly situated employees were not subjected to comparable treatment (¶¶ 55–57).

- 18 -

101.    Despite Plaintiff's efforts to address these issues, Defendant failed to provide resolution.

102.    Defendant knew or should have known that these conditions would compel a reasonable employee to resign.

103.    As a direct and proximate result of these conditions, Plaintiff reasonably concluded that her continued employment was untenable and that no reasonable alternative existed but to resign, and she resigned on June 26, 2024.

104.    As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer damages according to proof.

## DEMAND FOR RELIEF

Wherefore, Plaintiff's demand for judgment as to all of the claims for relief is as follows:

1.  For back pay, front pay, and lost benefits according to proof;

2.  For compensatory damages for emotional distress;

3.  For economic damages, including but not limited to retirement account withdrawals, tax penalties, and other consequential financial losses;

4.  For punitive damages;

5.  For costs of suit including attorney's fees; and

6.  For an award of interest, including prejudgment interest, at the legal rate as permitted by law;

7.  For such other and further relief as the Court deems proper and just under all the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action so triable.

- 19 -

DATED: April 22, 2026

JASMIN JOSEPH
In Pro Per